**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(SAN ANTONIO DIVISION)**

| | |
|---|---|
| PNC EQUIPMENT FINANCE, LLC,<br><br>  Plaintiff,<br><br>v.<br><br>R.A.S.H., LLC, MARTIN JOHN PHIPPS, and PHIPPS ANDERSON DEACON LLP<br><br>  Defendants. | Case No. 5:20-cv-942<br><br>**COMPLAINT** |

Plaintiff, PNC Equipment Finance, LLC, a subsidiary of PNC Bank, National Association, by and through its undersigned counsel, files this Complaint ("Complaint") against R.A.S.H., LLC, Martin John Phipps, and Phipps Anderson Deacon LLP, and complains as follows:

## I.
## PARTIES

1. Plaintiff, PNC Equipment Finance, LLC, a subsidiary of PNC Bank, National Association ("Bank" or "Plaintiff") is a national banking association with its principal office located at 4355 Emerald Street, Suite 100, Boise, Idaho 83706. The Bank conducts business in the State of Texas, but does not maintain a principal place of business within the State of Texas.

2. Defendant, R.A.S.H., LLC, is a Texas limited liability company with its principal place of business at 102 9th Street, San Antonio, Texas 78215, and may be served by and through its designated registered agent, Capitol Corporate Services, Inc., at the registered office located at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

3. Defendant, Martin John Phipps is an individual who is a citizen of the State of Texas that resides at 303 King William, San Antonio, Texas 78204.

4. Defendant, Phipps Anderson Deacon LLP, is a Texas limited liability partnership with its principal place of business at 102 9th Street, San Antonio, Texas 78215. Pursuant to TEX. BUS. ORG. CODE § 5.251, the Texas Secretary of State shall be Phipps Anderson Deacon LLP's agent for service of process and shall be served as such in this lawsuit because Phipps Anderson Deacon LLP has failed to appoint and does not maintain a registered agent in the State of Texas. Service upon the Texas Secretary of State of duplicate copies of this petition and citation directed to Defendant shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at P. O. Box 12079, Austin, Texas 78711-2079. The Texas Secretary of State shall immediately cause one of the copies of both this Complaint and Summons to be forwarded by United States mail, certified, return receipt requested, to Defendant at 102 9th Street, San Antonio, Texas 78215.

## II.
## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, Bank is an entity with its principal place of business in Boise, Idaho. It does not have a principal place of business in the State of Texas. Larry Goldman and Martin Phipps, who are the sole members of R.A.S.H., LLC, are citizens of the State of Texas. Similarly, R.A.S.H., LLC's principal place of business is in San Antonio, Texas. Phipps Anderson Deacon LLP's principal place of business is in San Antonio, Texas. Therefore, complete diversity of citizenship exists.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Bank's claims occurred in this district.

7. This Court has personal jurisdiction over the Defendants because the Defendants are Texas entities and a Texas citizen operating and residing in the State of Texas.

## III.
## FACTUAL BACKGROUND

*A. Security Agreement, Note and Guaranty*

8. R.A.S.H., LLC ("Borrower") and Martin John Phipps ("Guarantor" and together with the Borrower, the "Obligors") participate in the operations of at least one self-proclaimed successful law firm in San Antonio, Texas.

9. To facilitate Phipps Anderson Deacon LLP's nationwide practice of law, on or about August 30, 2017, Borrower executed and delivered to Bank that certain Aircraft Security Agreement with the Irrevocable De-Registration and Export Request Authorization dated August 30, 2017, which was recorded by the Federal Aviation Administration ("FAA") pursuant to Subtitle VII of Title 49 of the United States Code on September 18, 2017, as Conveyance No. WR002412, (as the same may have been or may be in the future assigned, amended, modified, supplemented and/or restated, collectively, the "Security Agreement"). A true and correct copy of the Security Agreement is attached to this Complaint as Exhibit "A."

10. Pursuant to the Security Agreement, Bank financed the acquisition of and was granted a continuing security interest in a `997 GULFSTREAM AEROSPACE (aka GULFSTREAM on the International Registry drop down menu), Model Number G-IV (aka Gulfstream G-IV (GIV-SP) on the International Registry drop down menu), Manufacturer Serial Number 1305, United States FAA Registration Number N44GV and two (2) ROLLS ROYCE Model Number TAY MK611-8 (aka TAY611 on the International Registry drop down menu) engines, Manufacturer Serial Numbers 16729 and 16730 (the "Engines") (collectively, the "Aircraft").

11. On or about August 31, 2017, pursuant to the terms of the Security Agreement, Bank paid Three Million, Three Hundred Thirty-Four Thousand, Three Hundred Fifty-Two Dollars & 01/100 Cents ($3,334,352.01) to Aero-Space Reports, Inc. on behalf of Borrower to purchase the Aircraft (the "Loan").

12. In connection with the Security Agreement and Loan, Borrower executed and delivered to Bank a Three Million, Three Hundred Forty Thousand & 00/100 Dollars ($3,340,000.00) promissory note dated August 30, 2017 (as the same may have been amended, modified, supplemented, and/or renewed, collectively, the "Note"). A true and correct copy of the Note is attached to this Complaint as Exhibit "B."

13. To further induce Bank to grant the credit accommodations to Borrower under the Note and Security Agreement, Guarantor executed and delivered to Bank that certain Guaranty dated August 30, 2017 (as the same may have been amended, modified, supplemented, and/or renewed, collectively, the "Guaranty"). A true and correct copy of the Guaranty is attached to this Complaint as Exhibit "C."

14. Pursuant to the Guaranty, Guarantor absolutely and unconditionally guaranteed the prompt payment and performance of Three Million, Three Hundred Forty Thousand & 00/100 Dollars ($3,340,000.00) plus all costs and expenses of enforcement of the Guaranty and collection and sale of any collateral securing the Guaranty including reasonable attorneys' fees (collectively, the "Guaranteed Obligations"). The Security Agreement, Note, Guaranty and all documents/agreements executed in connection therewith and related to the Loan (as the same may have been amended, modified, supplemented, and/or renewed) are hereinafter collectively referred to as the "Loan Documents." Capitalized terms not otherwise defined in this Complaint shall have the meaning given to such terms in the Loan Documents.

15. The Security Agreement provides the Bank with, *inter alia*, a continuing first priority perfected security interest (including an International Interest) in and to the Aircraft, as well as in, *inter alia*, the Aircraft's airframe, engines, any propellers and related log books, manuals, diagrams, records, contracts, agreements and leases (collectively, the "Aircraft Collateral") to secure, *inter alia*, the indebtedness evidenced by the Note.

16. Under the Security Agreement, the Bank has, *inter alia*, (i) the right to take possession of and remove the Aircraft Collateral and (ii) the full power to sell, lease, transfer, or otherwise deal with the Aircraft Collateral or proceeds thereof.

17. The Bank perfected its security interest in the Aircraft Collateral by recording a copy of the Security Agreement with the FAA and by filing a UCC-1 Financing Statement bearing filing number 17-0029856351 with the Texas Secretary of State on August 31, 2017. A true and correct copy of the UCC-1 Financing Statement filed by Bank is attached to this Complaint as Exhibit "D."

18. The Bank registered International Interests corresponding to the security interest granted to Bank in the Aircraft Collateral by the Security Agreement with the International Registry created by the Convention on International Interests in Mobile Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft signed in Cape Town, South Africa on November 16, 2001.

19. Beyond the mere payment obligations set forth in the Loan Documents, Borrower also made certain representations that it would continuously ensure that the Aircraft Collateral would be stored at the San Antonio International Airport and that the Engines remain enrolled in an Engine Maintenance Program while the Agreement is in effect. An "Engine Maintenance Program" means the maintenance program provided by or similar to, but not limited to, any of

the following: AlliedSignal's MSP, Allison's Power by the Hour, CFE Corp.'s CSP, Jet Support Services Inc.'s JSSI, Pratt & Whitney's ESP, Williams/Rolls' PBH, and EMS. On or after the execution of the Loan Documents, the Engines were enrolled in an Engine Maintenance Program with Rolls Royce. However, such enrollment has since ceased due to Borrower's failure to comply with its payment obligations under the Engine Maintenance Program with Rolls Royce.

20. To facilitate the Obligors' use of the Aircraft, the Bank, Borrower, and Phipps Anderson Deacon LLP (the "Subordinator") entered into a Subordination and Standstill Agreement on August 30, 2017 (the "Subordination Agreement"). A true and correct of the Subordination Agreement is attached to this Complaint as Exhibit "E."

21. Pursuant to the Subordination Agreement, Subordinator was granted the ability to operate and/or manage and/or lease the Aircraft in accordance with its separate agreement with Borrower. As consideration for this allowance, the Subordinator agreed that any interest it may have in the Aircraft Collateral is subordinate to the Bank's own interest. Further, the Subordinator agreed that upon notification of Borrower's default under the Loan Documents, Subordinator would remit any payments due to Borrower directly to the Bank.

22. Subordinator and Borrower entered into a Non-Exclusive Aircraft Lease Agreement on August 31, 2017 (the "Lease Agreement"), whereby Borrower leased the Aircraft to Subordinator for a lease term of three (3) years in exchange for monthly lease payments in the amount of $64,000.00. A true and correct of the Lease Agreement is attached to this Complaint as Exhibit "F." According to the Lease Agreement, the Aircraft Collateral is being improperly stored at Running M Hangar Services, 347 Sandau, San Antonio, Texas 78216.

23. Upon information and belief, the Subordinator or its subsequent corporate form, Phipps Deacon Purnell PLLC, have continuously enjoyed use of the Aircraft, despite knowledge of the Obligors' default.[1]

## B. Default by Borrower and Guarantor

24. Pursuant to the Note, Borrower was required remit sixty (60) consecutive monthly payments in the amount of $62,374.05 during the Fixed Interest Period (as that term is defined by the Payment and Rate Confirmation to the Note).

25. Borrower's failure to make any payment when due under the Note constitutes an event of default.

26. Additionally, Borrower's failure to ensure that the Engines remained enrolled in an Engine Maintenance Program while the Agreement is in effect constitutes a breach and default of the Agreement.

27. Upon any event of default under the Note, Borrower is no longer entitled to possession and beneficial use of the Aircraft Collateral.

28. Despite the Bank fulfilling its obligations under the Loan Documents, Borrower failed to remit the payment due on April 1, 2020, and has failed and refused to make all payments when due thereafter under the terms of the Payment and Rate Confirmation to the Note ("Specified Event of Default").

29. On April 23, 2020, the Bank was notified that the Engine Maintenance Program for the Engines had been terminated due to non-payment of required fees.

---

[1] According to the Subordinator's online advertising, it frequently obtains multi-million-dollar judgments across the country. Such litigation seemingly requires extensive air travel that was accomplished through its use of the Aircraft. *See* PHIPPS ANDERSON DEACON LLP, https://phippsandersondeacon.com (last visited July 29, 2020); *see also* PHIPPS DEACON PURNELL PLLC, https://phippsdeaconpurnell.com (last visited July 29, 2020).

30. Through a written letter by Bank dated May 1, 2020 ("Default Notice"), Bank notified the Obligors and Subordinator of the Specified Events of Default under the "Note Default" and "Other Defaults" subsections of the "Default" section of the Agreement (collectively, the "Events of Default"). A true and correct copy of the Default Notice is attached to this Complaint as Exhibit "G."

31. In the Default Notice, the Bank requested a report on the status of the Engine Maintenance Program, including: (1) the amount of the plan, (2) the total in arrears, and (3) the details of the Borrower's payment plan with the provider of said maintenance program. The Bank also advised the Borrower and Guarantor that Bank reserved the right to exercise any or all of its rights, powers, remedies and/or privileges under the Loan Documents, in addition to those at law and/or in equity with respect to the occurrence of the Existing Events of Default.

32. Certain Events of Default continued under the terms of the Loan Documents including, without limitation (i) the nonpayment of any principal, interest or other indebtedness under the Note when due and (ii) the failure of the Borrower and Guarantor to ensure that the Engines are enrolled in an Engine Maintenance Program (collectively, the "Continuing Events of Default").

33. Despite Bank providing the Default Notice, the Obligors failed to cure their past-due payment obligations or enroll the Engines in an Engine Maintenance Program as required by the Loan Documents. Bank notified the Obligors and Subordinator of the Continuing Events of Default through a written letter by Bank's counsel dated June 22, 2020 ("Default Letter"). A true and correct copy of the Default Letter is attached to this Complaint as Exhibit "H."

34. By means of the Default Letter, Bank demanded the Obligors remit the past due payments and cure the default amount of $195,255.87 by July 6, 2020. Upon Borrower and

guarantor's failure to comply with the demand conveyed in the Default Letter, Bank declared the amount of the total unpaid principal, interest, and other charges on the Loan Documents to be immediately due and payable.

35. Bank believes, and therefore avers, that additional defaults exist under the Loan Documents and therefore reserves its rights as to the same in all respects.

36. As of June 15, 2020, the past due principal, interest, default interest, prepayment premium, late charges and attorneys' fees on the Loan totaled $1,786,986.00 ("Default Amount").

37. Despite notice of the Obligors' default under the Loan Documents, Subordinator has failed to remit any payments due to Borrower directly to Bank as required by the Subordination Agreement.

38. Bank has demanded that Borrower and/or Guarantor pay the Default Amount and ensure that the Engines are re-enrolled in an Engine Maintenance Program.

39. To date, despite demand, Borrower and/or Guarantor have failed to pay the Default Amount, have failed to ensure the Engines remain enrolled in an Engine Maintenance Program, and have therefore failed to satisfy their obligations set forth in the Loan Documents. All the while, the Obligors have, upon information and belief, continued to operate their business, seemingly ignoring their ongoing obligations to the Bank.

40. Further, despite their default and contrary to the Bank's perfected security interest, the Obligors remain in possession and/or control of the Aircraft Collateral.

41. Thus, the Bank hereby demands that the Obligors immediately assemble the Aircraft Collateral and make it available to the Bank as required by the Security Agreement.

42. Upon information and belief, neither Borrower nor Guarantor have valid defenses for failing to fulfill their obligations set forth in the Loan Documents.

43. All conditions precedent to this action were satisfied, waived or occurred.

### C. *Waiver of Jury Trial and Attorneys' Fees*

44. Pursuant to the Loan Documents, the Obligors have expressly waived any right to any jury trial in any action, proceeding or counterclaim brought by either Bank or Borrower/Guarantor against the other.

45. Pursuant to the Loan Documents, the Obligors agreed to pay the Bank's costs and expenses, including the Bank's reasonable attorneys' fees and legal expenses incurred in connection with the enforcement of the Loan Documents.

46. The Bank has retained the law firm of Padfield & Stout, LLP to enforce the Bank's rights and remedies under the Loan Documents and the Bank is obligated to pay this law firm's attorneys a reasonable fee for their services.

## IV.
## CAUSES OF ACTION

### COUNT I – FORECLOSURE OF SECURITY INTEREST
(BANK V. R.A.S.H., LLC)

47. Plaintiff incorporates the allegations of the preceding paragraphs 1-46 of the Complaint as if fully restated herein.

48. Bank has a valid and perfected first priority perfected security interest in the Aircraft Collateral.

49. The Security Agreement authorizes Bank to take possession of and remove the Aircraft Collateral upon the occurrence of an event of default.

50. As averred above, Borrower defaulted on its obligations under the Loan Documents by, *inter alia*, failing to pay principal, interest or other indebtedness under the Note when due.

51.     Upon information and belief, the Aircraft Collateral was last located at Running M Hangar Services, 347 Sandau, San Antonio, Texas 78216.

52.     Bank is entitled to repossess the Aircraft Collateral.

53.     Bank is entitled to require Borrower to (i) deliver to Bank the Aircraft Collateral and all certificates of title and other documents relating to the Aircraft Collateral and (ii) assemble the Aircraft Collateral and make it available to Bank at a place designated by Bank.

54.     In the Default Letter, Bank advised the Obligors of its intent to pursue legal obligations available to it, including filing a lawsuit seeking turnover or foreclosure of Bank's interest in the Aircraft Collateral.

55.     Borrower has failed to prepare and assemble the Aircraft Collateral as instructed.

56.     Should the Aircraft Collateral be repossessed by the Bank, as permitted under the Loan Documents upon an event of default for nonpayment, the Bank may sell the Aircraft Collateral in accordance with state and federal law, including, without limitation, the applicable Uniform Commercial Code ("UCC"), and apply the sale proceeds to the debt represented by the Loan Documents or any judgment against the Borrower entered in this action.  Before the Aircraft Collateral can be sold, however, it may be necessary for it to be restored to good order and repaired to airworthy condition.  The expenses the Bank may incur to do so may be added to the debt owed by Borrower, as provided in the Loan Documents.

57.     If the sale proceeds are insufficient to cover the entire debt owed by Borrower, the Bank will seek a deficiency judgment against the Obligors.

58.     The Bank has performed all conditions precedent under the Loan Documents.

### COUNT II - BREACH OF CONTRACT
(BANK V. R.A.S.H., LLC)

59.     Plaintiff incorporates the allegations of the preceding paragraphs 1-46 of the Complaint as if fully restated herein.

60. As averred above, Borrower defaulted on its obligations under the Loan Documents by, *inter alia*, failing to pay principal, interest or other indebtedness under the Note when due and by failing to comply with its representation, warranty, and obligation to ensure the Engines remain enrolled in an Engine Maintenance Program.

61. Bank has suffered damages as a result of Borrower's breach of the Loan Documents, including, but not limited to, the Default Amount and such other exact amounts as may be proven at trial.

62. The Loan Documents provide that Bank shall recover its costs and expenses, including Bank's reasonable attorneys' fees and legal expenses incurred in connection with the enforcement of the Loan Documents.

63. Interest continues to accrue on the Default Amount at the Interest After Default rate as defined in the Note.

64. The Bank's costs and expenses, including Bank's attorneys' fees and legal expenses incurred in connection with the enforcement of the Loan Documents continue to accrue.

65. Despite Bank's demand for payment, Borrower has failed and refused to pay to the Bank the amounts due the Bank under the Loan Documents.

66. In addition, the Bank has exercised its right under the Security Agreement to require Borrower to enroll the Engines in an Engine Maintenance Program, but Borrower has failed to do so.

67. The Bank has performed all conditions precedent under the Loan Documents.

## COUNT III - ACTION ON GUARANTY
(BANK V. MARTIN JOHN PHIPPS)

68. Plaintiff incorporates the allegations of the preceding paragraphs 1-46 of the Complaint as if fully restated herein.

69. As averred above, Borrower defaulted on its obligations under the Loan Documents by, *inter alia*, failing to pay principal, interest or other indebtedness under the Note when due and by failing to comply with its representation, warranty, and obligation to ensure the Engines remain enrolled in an Engine Maintenance Program.

70. Guarantor, Martin John Phipps, has failed to meet his obligations under the Guaranty by, *inter alia*, failing to pay the Guaranteed Obligations.

71. Bank has suffered damages as a result of Martin John Phipps' breach of the Guaranty, including, but not limited to, the Guaranteed Obligations and such other exact amounts as may be proven at trial.

72. The Guaranty provides that Bank shall recover its costs and expenses, including Bank's reasonable attorneys' fees and legal expenses incurred in connection with the enforcement of the Loan Documents.

73. Interest continues to accrue on the Default Amount at the Interest After Default rate as defined in the Note.

74. The Bank's costs and expenses, including Bank's attorneys' fees and legal expenses incurred in connection with the enforcement of the Loan Documents continue to accrue.

75. Despite Bank's demand for payment, Martin John Phipps has failed and refused to pay to Bank the amounts due Bank under the Guaranty.

76. The Bank has performed all conditions precedent under the Loan Documents.

## V.
## REQUEST FOR EQUITABLE RELIEF

77. Pursuant to paragraph 5 of the Subordination Agreement, upon notice of Borrower's Default in connection with the Loan, Subordinator agreed that "… so long as Subordinator remains in possession of the Collateral, Subordinator shall pay all sums due under Subordinator's Interest direct to Lender."

78. The Bank has at all times performed its obligations as required by the Loan Documents and the Subordination Agreement and the Bank remains ready, willing, and able to continue its performance thereunder.

79. Subordinator was notified of Borrower's default through the Default Notice dated June 22, 2020; thus, all payments due thereafter to Borrower from Subordinator under the Lease Agreement must be paid directly to the Bank.

80. The Bank respectfully requests that the Court enter an order directing Subordinator to perform its obligations under the Subordination Agreement and to forward any such payments becoming due to Borrower directly to the Bank.

81. Such remedy is both equitable and just in light of the Obligors' failure to comply with their contractual obligations to the Bank.

82. Additionally, should the Obligors fail to voluntarily turnover the Aircraft Collateral pursuant to the Bank's demands, the Bank intends to file a separate motion for a replevin. Upon information and belief, Phipps Anderson Deacon LLP is in possession of the Aircraft Collateral and additional causes of action, including conversion, may arise against said party or any other third party in possession of or utilizing the Aircraft Collateral.

## VI.
## CONCLUSION AND PRAYER

WHEREFORE, PNC Equipment Finance, LLC respectfully prays that Defendants R.A.S.H., LLC and Martin John Phipps be cited to appear and answer herein and that upon final hearing hereof, the Court: (1) enter a judgment in the above-captioned action that the Bank is entitled to judgment in its favor and against R.A.S.H., LLC and Martin John Phipps, jointly and severally, in the amount due under the Loan Documents and in the amount proven at trial, plus pre-judgment interest, and post-judgment interest on any judgment accruing at the Interest After Default rate as defined in the Note from and after April 1, 2020, plus accruing attorneys' fees, costs, and expenses accruing after April 1, 2020 (collectively, the "Judgment Amount"); (2) enter a judgment in the above-captioned action that the Bank is entitled to possession of the Aircraft Collateral; (3) enter an order directing the Borrower to immediately surrender possession of the Aircraft Collateral to Bank or its duly authorized representative; (4) enter an order that the Bank shall have the right to sell the Aircraft Collateral at public or private sale pursuant to the UCC as determined by the Bank (i.e., "as-is" condition, auction, private sale, etc.), and the Bank shall have no obligation to incur the costs and expense of repairing the Aircraft Collateral prior to the auction or private sale or otherwise, provided that such sale is conducted in accordance with the UCC and that the net proceeds shall be applied to the amounts owing under said judgment; (5) enter an order directing Subordinator Phipps Anderson Deacon to perform its obligations under the Lease Agreement and remit all future payments due to Borrower under said agreement directly to Bank and (6) the Bank is entitled to judgment for such other relief as is just and equitable under the circumstances.


DATED:  August 11, 2020

**PADFIELD & STOUT, LLP**
420 Throckmorton, Suite 1210
Fort Worth, Texas 76102
Phone: (817) 338-1616
Fax: (817) 338-1610

By: /s/ Mark W. Stout
Mark W. Stout
State Bar I.D.  # 24008096
mstout@padfieldstout.com
Christopher V. Arisco
State Bar I.D. # 24064830
carisco@padfieldstout.com